73 So.2d 781 (1953)
225 La. 618
MEYER
v.
ST. PAUL-MERCURY INDEMNITY CO. OF ST. PAUL, MINN. et al.
No. 41148.
Supreme Court of Louisiana.
December 14, 1953.
On Rehearing May 31, 1954.
*782 Rosen, Kammer, Hopkins, Burke & Lapeyre, New Orleans, for plaintiff, appellant and petitioner.
Lemle & Kelleher, Harry B. Kelleher, Carl J. Schumacher, Jr., Denechaud & Denechaud, John T. Charbonnet, Adams & Reese, Manuel I. Fisher, Herbert J. Garon, New Orleans, for defendants-appellees-respondents.
HAMITER, Justice.
During the morning of June 30, 1950, in the operating room of Hotel Dieu which is a hospital located in the City of New Orleans, Mrs. Eugenie Meyer Barnett was receiving a general anesthetic, preparatory to the extraction of all of her remaining teeth, when an upper front tooth became dislodged and found its way into one of her lungs.
The tooth was removed from the lung, and thereafter she instituted this suit to recover damages allegedly sustained, she charging malpractice to Dr. Leopold L. Levy, the oral surgeon employed, and to Dr. Evelyn Katz, the performing anesthetist who is a physician. Also impleaded as defendants were certain alleged liability insurance carriers and the corporation operating the hospital.
After trial the district court held that the doctrine of res ipsa loquitor is inapplicable to the cause and that the plaintiff had failed to sustain the burden of proving negligence on the part of any of the defendants. Accordingly, the suit was dismissed.
The Orleans Court of Appeal, on an appeal to it, reached the conclusion that the mentioned doctrine is applicable and that, by reason thereof, the defendants carried the burden of showing absence of negligence. But it further concluded that the defendants had discharged that duty. Consequently, it affirmed the district court's judgment. See 61 So.2d 901.
This court, on plaintiff's application, issued the writ of certiorari or review. In granting the writ a majority of the members entertained some doubt that the Court of Appeal's decision was correct on the facts which it had found.
However, after considering the established facts in the light of the appropriate jurisprudence of this state, even assuming for the sake of argument that the doctrine of res ipsa loquitor is applicable here (we need not and do not determine whether it applies), we are now satisfied that the district court and the Court of Appeal correctly decreed a dismissal of the suit.
A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. Stern v. Lanng, 106 La. 738, 31 So. 303; Roark v. Peters, 162 La. 111, 110 So. 106; Comeaux v. Miles, 9 La.App. 66, 118 So. 786; Freche v. Mary, La.App., 16 So.2d 213; Brashears v. Peak, La.App., 19 So.2d 901; Wells v. McGehee, La.App., *783 39 So.2d 196. See also 70 C.J.S., Physicians and Surgeons, § 41.
From the record it appears that on or about June 15, 1950 plaintiff was advised by her regular dentist, Dr. Armand R. Suarez, to have extracted all of the teeth which she then possessed, he suggesting that they be removed under general anesthesia. This was deemed necessary because of an existing pyorrhetic condition which previously (since 1947) had prompted his pulling, from time to time, five of her teeth, although they were firmly imbedded. For performing the extractions Dr. Suarez recommended that plaintiff employ Dr. Levy, one of the defendants and a dentist specializing in exodontia oral surgery, with whom he secured an appointment for her.
As scheduled she consulted Dr. Levy on June 26, 1950 (and again on June 28), requesting that he extract her teeth at the hospital. He looked into her mouth, found a generalized condition of pyorrhea, and noticed that a tooth on the upper left side appeared to be loose. But he made no close examination of each tooth for the purpose of determining the question of its looseness. According to plaintiff there were no loose teeth except the one that Dr. Levy had observed. In this connection she testified:
"Q. Were you ever told by Dr. Levy or anyone else before this extraction of your teeth if any were loose except the one you told us about? A. Dr. Levy never said anything about my teeth except he noticed this loose tooth. That was the only one he mentioned.
"Q. That was the tooth on the side? A. That was the only one.

* * * * * *
"Q. To your knowledge were your other teeth loose? A. They were not.
"Q. In particular, was the front tooth that you claim was knocked out in the operating room loose? A. It was not."
Dr. Levy requested that her family physician (a Dr. Rougelot) examine her and certify as to her good physical condition and also make reservations at Hotel Dieu for the operation. When that had been performed he furnished written instructions to the hospital which were delivered on her admission there.
Shortly after plaintiff was brought into the operating room of Hotel Dieu on the morning of June 30, 1950 Dr. Evelyn Katz, a defendant herein and the anesthesiologist in charge of the Department of Anesthesia at the named institution, had the patient placed on the table (lying on the back) and made preparations for administering the anesthetic. Others in the room at the time were a registered nurse, a scrub nurse, and Dr. Levy.
Knowing that the operation called for the extraction of all of the teeth, which she had noticed but had not carefully examined, Dr. Katz planned to resort to the often used method that leaves the mouth unobstructed and is known as nasal endotracheal intubation. As correctly stated in the Court of Appeal's opinion, "* * * This method requires that a rubber tube be passed through the nose and that the tip of it be seated behind the trachea. To insert this tube there must be employed a laryngoscope, the one used in this case being known as a Guedel laryngoscope, which is a metallic instrument the body of which is held in the hand of the anesthetist, and which body is about the size of the ordinary household flashlight. Attached to the upper end of this instrument is a flat piece of metal several inches in length, about as wide as the blade of a wide table knife, and which is about an inch or more in thickness from the top to the bottom, at the rear end, and tapers to about one-half inch at the forward end. On the forward end of this upper extension there is a flashlight, which enables the anesthetist to see just where the rubber tube is being placed as it enters the throat after having passed through the nose. When this laryngoscope is inserted into the mouth, it obviously occupies almost the entire opening between the lips."
*784 As a preliminary to resorting to the mentioned method the anesthetist gave ether to the patient through a mask placed over the face. When a deep sleep ensued, she removed the mask and sought to pass through the nose and to set in the larynx, with the aid of the larynogoscope, the intratracheal tube. Ultimately, and with much difficulty, the passing and setting were accomplished. Then the tube was connected to the appropriate machine, the giving of the anesthetic was resumed, and the laryngoscope was removed from plaintiff's throat and mouth.
About this time discovery was made of a bleeding socket, from which a tooth was missing, in the upper front part of the mouth. Dr. Levy, who had been in the room the entire time except for a few moments when scrubbing and washing his hands in preparation for the operation, says that he discovered it on opening the mouth, after the anesthetist had announced readiness of the patient for the extractions, and that he informed Dr. Katz of his finding. The latter thinks that they observed the bleeding, empty socket simultaneously, while Dr. Levy was standing nearby and she was attempting to effect stability as between the patient and the anesthesia machine. But the matter of who first noticed the condition appears unimportant, especially in view of the fact that it was discovered and acted upon as soon as possible, that is immediately on the removal of the view obstructing laryngoscope which had practically filled the opening between plaintiff's lips.
A search was promptly started for the missing upper front tooth. Having been unable to locate it in the mouth or on the table, Dr. Levy ordered and obtained shortly an X-ray which disclosed the object in the patient's right lung. Thereupon she was taken to the bronchoscopic room of the hospital where the tooth was removed with a bronchoscope by a Dr. Taquino, a specialist in the use of that instrument. After the bronchoscope had been withdrawn Dr. Levy examined the patient and discovered that the side tooth initially determined to be loose had been knocked out during the bronchoscopy and was lying in the mouth. He withdrew it with his fingers.
As a result of the mentioned accident the planned operation by Dr. Levy was not performed. However, in June, 1951, approximately a year later, plaintiff engaged another dentist, Dr. Ralph Sherwood, who extracted her upper teeth. To quote plaintiff: "He gave me novocain when he extracted the teeth. The teeth were so hard to come out he used both hands to pull my teeth out. He even turned to the girl that assisted him, he said, `Did you ever see such hard teeth to come out?'" As to the lower teeth she testified: "When he looked at them, examined them, he told me he would refuse to take out the lower and said positively not to take out the lower teeth because they were good for another ten years."
On behalf of Dr. Levy and Dr. Katz it was established, we think, as the Court of Appeal appropriately pointed out in great detail, that they were eminently qualified by education and experience to practice in the respective branches of medicine in which they were engaged at the time of the instant mishap, and that in the administering of the anesthetic they did everything reasonably required of them under the circumstances. But even if it could be said that each was negligent in not having closely examined plaintiff's teeth for looseness before the commencement of the intubation, as plaintiff's counsel principally contends, the failure in that respect had no causal connection with the accident. According to plaintiff's own testimony, quoted herein above, she possessed only one loose tooth and it was not that which found its way into the lung. The unfortunate occurrence evidently resulted only from the laryngoscope's coming in contact with plaintiff's upper front teeth, which was impossible to avoid, and was something that may take place (according to the uncontradicted evidence) in spite of the exercise of the most extreme care.
Our views are now in accord with the Court of Appeal's conclusion "that both *785 Dr. Levy and Dr. Katz did all that reasonably careful practitioners, skilled in their respective professions, could have done, and that consequently there is no liability in either. The necessary consequence is that there is no liability in any of the defendants."
For the reasons assigned the decree of the Court of Appeal is affirmed.
PONDER, J., dissents.
McCALEB, J., dissents with written reasons.
McCALEB, Justice (dissenting).
I think that Drs. Levy and Katz were negligent in that they both failed to provide plaintiff with any protection from a known danger. Initially, there can hardly be any doubt as to the soundness of the view of the Court of Appeal that the doctrine of res ipsa loquitur applies to the case. Therefore, the physicians carried the burden of proving that the accident did not proximately result from a lack of care on their part.
The Court of Appeal and the majority of this court are of the view that, since Drs. Levy and Katz are skilled specialists in their particular lines of endeavor and since the accident befalling plaintiff may be said to be inherent in this type of operation, they are not responsible as it is shown that they did all that was required of them by administering the anesthetic conformable to the usual practice and custom prevailing in such cases.
For my part, I believe that the doctors owed to plaintiff a duty of care over and above their skill. They were required to use diligence in guarding plaintiff against all foreseeable dangers which might be encountered in the performance of the operation. It is admitted by both physicians and is shown by the testimony of their expert, Dr. Adriani, that the use of the laryngoscope involves hazards, in cases where the patient has loose teeth, because one or more of the carious teeth may become dislodged when the instrument is inserted into the mouth. Therefore, Drs. Levy and Katz were, and should have been, aware of the danger as it cannot be gain-said that some of plaintiff's teeth, if not most of them, were carious. Albeit, the purpose of the operation was to remove all her teeth which were diseased as a result of pyorrhea. Accordingly, it will not do in my judgment to excuse these doctors from their plain lack of diligence, in failing to do anything to guard against this accident, to conclude that they did all that was expected of them because they were skillful and administered the anesthetic in the usual manner.
That they could have provided some protection to plaintiff is plainly shown by the evidence. Indeed, their own expert, Dr. Adriani, stated that he always takes precautions against the dislodging of a tooth under conditions like those presented here; that he does not report the patient ready for the operation (extraction) until he has made a check of the teeth; that he always inspects them before using the laryngoscope and that, if any are loose, he removes them ahead of time.
Therefore, since Dr. Katz did not take any of these precautions, it appears to me that she was negligent.
Dr. Levy stated that he made a casual examination of plaintiff's teeth before the operation and discovered that at least one of them was loose. Under the circumstances, it seems to me that, as he knew the dangers attendant to the use of the laryngoscope, common prudence dictated that he be on hand during the insertion of the instrument in plaintiff's mouth as he could have easily observed the dislodging of her upper front tooth, stopped further proceedings and, thus, averted the unfortunate accident.
The majority opinion lays stress on plaintiff's statement that there were no loose teeth in her mouth, other than the one observed by Dr. Levy on the day he examined her, as one of the factors for *786 concluding that the accident was unavoidable. But, if it be assumed that plaintiff was correct in saying that her front teeth were sound (which I doubt), I still find it difficult to fathom how this helps the case of the defendants. On the contrary, it would appear that if good, strong teeth were knocked out in the performance of the operation, it would exhibit a plain case of negligence on the part of the physicians.
I respectfully dissent.

On Rehearing
LE BLANC, Justice.
This is the sixth time this case has received consideration by the Courts in which it has appeared. It was initially tried and decided in the district court where it was reconsidered on a motion for re-hearing. It was appealed to and decided by the Court of Appeal for the Parish of Orleans where again a motion for re-hearing was considered and acted on and then the judgment of that Court was reviewed on writs granted by this Court. In each instance the decision of each Court was unfavorable to the plaintiff with only two of the justices of this Court disagreeing. Industrious counsel have succeeded in obtaining a rehearing on which the case has been resubmitted. After such thorough consideration, it would seem that there is little more to be added to all that has been said unless this Court be now convinced of error all the way through, up to now, and there necessarily should be a reversal of all the judgments heretofore rendered.
All of this does not mean, of course, that we have not again given careful consideration to the case. After having done so however we find that all the points and issues presented are the same as have been urged throughout the various stages as it progressed through the different Courts and we still fail to find that manifest error has been committed in applying the facts to the particular rule of law that is involved. The facts are not seriously disputed and the law is rather simple.
We might mention, as was stated in the original opinion, that there was a disagreement between the district judge and the Court of Appeal with regard to the applicability of the doctrine of res ipsa loquitur but, as also intimated in the opinion, the applicability of that rule was not of grave importance in considering the facts of the case in the light of the jurisprudence of this State in cases of this kind. That jurisprudence as pointed out in the original opinion is that the law only exacts of physicians, surgeons and dentists that degree of skill and care which is usually possessed and exercised by practitioners of their profession in the same locality or community and makes it their duty to use reasonable care and diligence, along with their best judgment, in the application of their skill to the case before them. Regardless of what the jurisprudence may be in other jurisdictions, this Court and the Courts of Appeal of the State have adopted the rule as stated as is made apparent in the several cases cited in the original opinion.
The rule makes it incumbent on the physician, surgeon or dentist who becomes defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in applying that skill to the given case he used reasonable care and diligence along with his best judgment. The rule therefore may be said to bear some relation to the doctrine of res ipsa loquitur which places the burden on a defendant having control of the dangerous instrumentality which caused an accident to show his freedom from negligence in a case where such accident would not ordinarily have occurred had proper care and use been made of the instrumentality. As stated by the Court of Appeal in its opinion in this case, however, that does not mean that the defendant must show just what was the cause of the occurrence.
In this case the rule may well apply to the anesthetist, Dr. Evelyn Katz as she was the one handling the dangerous instrumentality which came in contact with *787 the plaintiff's upper teeth and allegedly caused one to become dislodged. But Dr. Leopold Levy, the operating oral surgeon, had nothing to do with the instrument; it never was under his control, and we fail to see why he should be called on to exculpate himself from negligence in the use of it. As to him it would seem that liability would have to be determined on some other ground and that in order to free himself he would have to show the skill required under the rule and that in preparing for the extraction of plaintiff's teeth he exercised reasonable care and diligence and used his best judgment.
Both Dr. Katz and Dr. Levy are admittedly practitioners of high standing in their respective fields. Dr. John A. Adriani, a recognized authority on the subject of anesthesia, expressed the opinion that Dr. Katz was an expert in that particular branch of medicine and stated that she has all the qualifications necessary. She is the head of the Department of Anesthesia at Hotel Dieu and has eight nurses working under her. The administering of anesthesia, as had to be done in this case, is an intricate and rather complex procedure. It requires the utmost attention of the anesthetist who has to manipulate the instrument, an accepted model of laryngoscope such as was used in this case and which is bound to come in contact with the teeth, according to Dr. Adriani's expert testimony. Significantly this expert also states that an accident such as happened may take place in spite of the use of the most extreme care and he considers himself fortunate that it hasn't happened to him. That, it strikes us, goes a long way in disposing of the question of the foreseeability of such an occurrence, a point so strongly urged by counsel for plaintiff.
There is nothing found in the record of this case to show that Dr. Katz did not use the proper and usual technique and employ the same skill as other practitioners in her field, in handling the instrument she was required to use in administering to this patient and no one, we surmise from her testimony, was more surprised than she when it was discovered that a tooth in the patient's mouth had been dislodged.
It is argued again that Dr. Katz had the duty of taking the extra precaution, even beyond her usual skill, of examining the patient's mouth to find out if there were any loose teeth which might be dislodged by coming in contact with the laryngoscope, but Dr. Katz testified that she did observe the teeth and, apparently, she must have considered it proper after such observation as she made, to insert the instrument in the patient's mouth. In doing this she used her best judgment and followed what was the accepted method of procedure. That, as we have seen, was the obligation imposed on her under the rule of law which governed the case. Moreover, in considering this point, the testimony is to the effect that the particular tooth which was involved in this accident, was not a loose tooth and this, we think, accentuates Dr. Adriani's expert testimony that such an occurrence may take place despite the exercise of the most extreme care.
Dr. Levy is also charged with negligence in not having examined plaintiff's teeth before the anesthesia was administered. But Dr. Levy was the oral surgeon to whom plaintiff had been recommended and sent by her own dentist for the purpose of extracting all her teeth. Her dentist who had had her under observation was familiar with her condition and apparently he did not think it was necessary for himself to take or advise the taking of precautions such as Dr. Katz and Dr. Levy are both being charged with negligently having failed to take. If the patient was sent to Dr. Levy for the extraction of all her teeth, which operation was to be done under complete anesthesia, we cannot see how he was remiss in his duty in failing to extract one or more teeth before the administration of the anesthesia.
It is again urged that Dr. Levy should have remained by the side of the patient when the anesthesia was being *788 given and, as we further understand, should have in some way directed the anesthetist in the procedure. But, as stated by the Court of Appeal, Dr. Levy's testimony and the record is convincing, that it is not customary for a surgeon, or an oral surgeon, to remain by the side of the patient when the anesthetic is being administered. We think that point is fully covered in the opinion of the Court of Appeal and what more we would say on it would only be in the nature of repetition.
We reaffirm our views and the conclusions reached on the original hearing and for the further reasons herein stated,
It is now ordered that the former judgment and decree herein rendered be made final.
FOURNET, C. J., concurs in the decree.
PONDER, J., dissents.
McCALEB, J., dissents adhering to the views he has heretofore expressed.
MOISE, J., dissents and has assigned written reasons.

On Rehearing
MOISE, Justice (dissenting).
The question for decision in all cases must be answered by each judge according to the structure of his mind, according to his experience, according to his habit of thought and according to his intelligence, his prejudices and his genius.
It is the law relating to physician or surgeon that when they receive a patient for treatment, they do not guarantee a cure, but they will render to their patient care and attention and use the approved methods provided for the profession in the place where treatment is given. This law relating to physicians remains unimpeached, but in the instant suit the pleadings show that this is not a case where there is drawn the question of diagnosis nor the matter of treatment nor an operation by a physician or surgeon. It is decidedly not one of malpractice. No such charge is intimated nor made. There is no averment that the treatment or operation was unprofessional. The theory of the plaintiff's case is that in submitting herself for treatment by the physicians, there was used a modern device laryngoscopeand in the use there was a failure in the necessary care to prevent the knocking out of a tooth in her mouth which found lodgment in her lung and there remained until removed. The occurrence of this untoward act produced a positive injury to plaintiff.
The physician here was in a better position to know the real cause of the accident. The unusual accident and the involved circumstances make the case come under the rule of evidence of res ipsa loquitur because at the time of the injury, the plaintiff was unconscious and under the influence of an anesthetic. Therefore, the injury sustained was provoked through no fault of hers, and, under the attending circumstances, the highest professional skill should have been exercised because duties are to be gauged according to the circumstances and conditions under which the physician is called on to act. Here, care and skill are indissoluble.
A study of a composite list of authorities in other jurisdictions discloses that the professional manalthough skillfulwho leaves a danger unguarded in a continuous chain of treatment, and if in such instance there is an omission which results in injury to the patient, the rule of evidence of res ipsa loquitur is to the effect that the physician must show a lack of negligence on his part. In my opinion, this requirement was not met.
I respectfully dissent.